Daniel Low (Bar #218387)
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Fax: (202) 280-1128
Email: dlow@kotchen.com

Attorney for Plaintiff Reese Voll and Putative Class

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| REESE VOLL,<br><br>Plaintiff,<br><br>v.<br><br>HCL TECHNOLOGIES LTD. and HCL AMERICA, INC.,<br><br>Defendants. | Case No.: 5:18-cv-4943<br><br>**COMPLAINT**<br><br>FOR EMPLOYMENT DISCRIMINATION<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Reese Voll brings this action on behalf of himself and a class of similarly situated individuals to remedy pervasive, ongoing race discrimination by Defendants HCL Technologies Limited and HCL America, Inc. (collectively, "HCL"), and alleges as follows:

## NATURE OF THE ACTION

1. HCL Technologies Limited is an Indian company that provides information technology and consulting services to customers worldwide. HCL employs almost 118,000 employees, approximately 12,000 of whom are located in the United States. While roughly 1-2% of the United States population, and about 12% of the relevant labor market, is South Asian, approximately 70% (or more) of HCL's United States-based workforce is South Asian (primarily from India).[1] As

[1] As used herein, "South Asian" refers to individuals who trace their ancestry to the Indian sub-continent. *See, e.g.*, *Fonseca v. Sysco Food Serv. of Az., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004) ("Under 42 U.S.C. § 1981, discrimination based on ancestry or ethnic characteristics is prohibited" as discrimination based on race) (citation omitted).

discussed below, this grossly disproportionate workforce is the result of HCL's intentional pattern and practice of employment discrimination against individuals who are not South Asian, including discrimination in hiring, promotion, and termination decisions.

2. HCL's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"). Plaintiff seeks, on his own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress HCL's pervasive pattern and practice of discrimination.

**PARTIES**

3. Plaintiff Reese Voll is a citizen of the United States of America, born in the United States, and of Caucasian race. He is a resident of Texas. Plaintiff is a member of a protected class, as recognized by § 1981.

4. Defendant HCL Technologies Limited is an Indian multinational company that provides technology services, products, and engineering, including business consulting and outsourcing services, to clients located worldwide. HCL Technologies Limited is headquartered in Noida, India and maintains its U.S. headquarters in Sunnyvale, California.

5. Defendant HCL America, Inc. is a wholly-owned subsidiary of HCL Technologies Limited and was incorporated in California in 1988. HCL America, Inc. has 25 offices within the United States and is also headquartered in Sunnyvale, California. HCL America, Inc. provides business services similar to HCL Technologies Limited, including consulting and information technology services.

**JURISDICTION**

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1981(a).

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign

corporation.

8. This Court has personal jurisdiction over HCL because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of offices in Sunnyvale, California (its U.S. headquarters), Irvine, California, and Lake Forest, California.

**VENUE AND INTRADISTRICT ASSIGNMENT**

9. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because HCL resides in this District, conducts business in this District, engaged in discriminatory conduct in this District, and employment records relevant to HCL's discriminatory pattern and practice are maintained and administered in this District. Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to this matter's claims occurred in this Division. Additionally, HCL engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of its United States headquarters in Sunnyvale, California.

**STATEMENT OF FACTS**

*Overview of HCL's Business Model*

10. HCL has 25 offices in the United States and employs approximately 12,000 employees domestically. HCL earned over $7.8 billion in revenue in the past fiscal year, and derives approximately 63% of its revenue from the United States (HCL's largest market).

11. HCL contracts with U.S. companies to provide IT-related services. Once HCL secures a contract with a client, it hires individuals to fill positions to service the client. Individuals must apply and interview for these positions. Once a position servicing a client comes to an end (or if an employee is removed from a position), individuals are placed in an unallocated status, also known as being "benched." Once on the bench, individuals must again seek new positions within HCL, going through an application and interview process, just as external applicants must.

*Overview of HCL's Discriminatory Scheme*

12. HCL has engaged in a systematic, company-wide, pattern and practice of discrimination in

favor of South Asians and against individuals who are not South Asian in hiring, promotion, and termination decisions.

13. HCL prefers South Asians in employment decisions and has instituted four corporate practices to fulfill its discriminatory preference. First, HCL engages in a practice of securing H-1B and L-1 visas for South Asian workers located overseas who will then be used to staff U.S. positions. The federal government annually awards 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees). These visas are awarded on a lottery basis. Given the cap on H-1B visas, companies compete to secure visas for prospective visa workers. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year. H-1B visa petitions must identify an actual job at a specific location that the prospective visa worker will fill if awarded a visa.

14. To fulfill its employment preference for South Asians, HCL seeks to maximize the number of visas it receives each year from the federal government. HCL submits visa petitions for more positions than actually exist in the U.S. in order to maximize its chances of securing the highest number of available H-1B visas from the lottery process. In this way, HCL has been able to secure visas for far more individuals than it actually has a present need for. For example, HCL is consistently one of the top-10 H-1B visa recipients in the U.S., and from 2015 to 2017, HCL received 10,432 new H-1B visas and 310 L-1 visas, far more positions than could actually exist given that HCL only employs approximately 12,000 individuals in the United States.

15. All, or substantially all, of the individuals for whom HCL secures visas are South Asian. While both individuals already located in the U.S. and foreign individuals who are visa-ready are considered for open positions in the U.S., as a matter of corporate practice, “visa ready” individuals are given first – if not exclusive – preference. HCL’s explicit preference to staff visa holders in U.S. positions minimizes or eliminates competition for the jobs from non-South Asians residing in the U.S. Similarly, non-South Asian individuals are often displaced from their current positions in favor of South Asian and visa-ready individuals. Non-South Asians are then disproportionately relegated to the bench, as jobs are given to visa-holding South Asians from India.

16. Second, HCL's discriminatory preference is fulfilled through its corporate practice of seeking out and preferring to hire South Asians residing in the U.S. rather than non-South Asians. For example, HCL relies on third party recruiters to supply HCL with South Asian job applicants. The third party recruiters themselves are predominantly South Asian. HCL also sources South Asian job applicants from internal recruiting sources. As a result, and on information and belief, HCL's "local hiring" (*i.e.*, hiring of individuals who already reside within the U.S.) disproportionately favors South Asians.

17. Third, because of its discriminatory preference for South Asians, HCL promotes South Asians at disproportionately high rates compared to non-South Asians. Employees in the U.S. are awarded annual appraisals, and are appraised on a five-point scale of "Distinguished Performance," "Exceptional Performance," "Good Performance," "Threshold Performance," and "Performance Needs Improvement." Promotions at HCL are tied to an employee's appraisal, and employees receiving scores of "Distinguished Performance" or "Exceptional Performance" are more likely to receive a promotion from HCL. On information and belief, non-South Asians are disproportionately awarded lower appraisal scores, and thus, non-South Asians are promoted less frequently than South Asians at HCL.

18. Fourth, HCL terminates non-South Asians at disproportionately high rates compared to South Asians. For example, HCL has a policy to terminate employees who are on the bench for more than four weeks. Because South Asians are given preference for new positions, and these individuals are used to displace non-South Asians on existing projects, non-South Asians are disproportionately relegated to the bench and unable to secure new positions within HCL. This, among other things, leads to their termination at disproportionate rates compared to South Asians.

19. HCL's U.S. workforce reflects the result of its discriminatory scheme. At least 70% (if not more) of HCL's United States-based workforce is South Asian (primarily from India), as is the vast majority of its managerial and supervisory-level staff. By contrast, during the 2010 census, all Asian subgroups combined made up 4.8% of the U.S. population. South Asians made up 1-2% of the U.S. population and about 12% of the U.S. IT industry.

*Plaintiff's Experiences*

20. Plaintiff Reese Voll is a highly skilled Server Systems, Network, Virtualization, Storage Engineering, and Solutions Architect with over 25 years of professional experience supporting Global business information systems and working in top ten global Tier 1 data centers. Plaintiff is a Microsoft Certified Systems Engineer, a Cisco Unified Computing Technology Support Specialist, an IBM PureSystems Certified Specialist, and also holds certifications in VMWare VSP, VTSP, and Hatchi VSP. He is experienced in the design, configuration, installation, and support of hardware and software on all current Intel, UNIX and compatible platforms, and specializes in analyzing and resolving complex LAN/WAN/SAN/NAS network performance issues and outages. Plaintiff began working for HCL in November 2014.

21. Plaintiff was hired by HCL to serve as a member of its internal Solution Architecture Practice S.W.A.T. team. This team was designed to transition and transform the IT infrastructure of HCL clients and to resolve issues faced by those accounts. Plaintiff worked for almost two years in a Solution Architect / Chief Architect role servicing HCL client PepsiCo in Dallas, Texas and was responsible for resolving infrastructure-related issues for PepsiCo as it transitioned from twelve to five global data centers. The S.W.A.T. team was staffed with five additional HCL employees who worked on various HCL client accounts across the United States. On information and belief, Plaintiff was the only member of the S.W.A.T. team who was not South Asian.

22. Plaintiff reported to three HCL employees during his tenure with the company – Walter Agar, a Director on the PepsiCo account, Ayut Patel, Senior Vice President – Head, Strategic Engagements for HCL, and Sanjay Kohli, a Director-level employee at HCL. Both Mr. Patel and Mr. Kohli are South Asian.

23. Approximately 250 HCL employees serviced PepsiCo in Dallas, Texas, of which, around 200 individuals were "re-badges," *i.e.*, employees hired directly from PepsiCo by HCL. The vast majority of the 50 or so HCL workers not hired from PepsiCo were South Asian visa holders. On information and belief, the contract between HCL and PepsiCo required all re-badges to be retained by HCL for a two-year period. Upon the expiry of this two-year period, many re-badges were

replaced by HCL with South Asian visa holders and the re-badge employees from PepsiCo were placed on the bench and subsequently terminated.

24. While servicing PepsiCo, Plaintiff observed HCL's preference for staffing client projects with South Asians first-hand. For instance, the vast majority of HCL employees hired to service PepsiCo were South Asian and on multiple occasions, both Mr. Patel and Mr. Kohli informed Plaintiff that HCL's business plan was to bring H-1B visa holders from India to staff open positions in the United States. Moreover, on multiple occasions, Plaintiff was asked to interview external candidates for HCL's S.W.A.T. team. On information and belief, the vast majority of these candidates were visa-dependent South Asians, currently employed by other companies in the United States on H-1B visas.

25. While performing his Solution Architect / Chief Architect role, Plaintiff was subject to a hostile work environment by HCL employees. For example, when Plaintiff was hired to replace the Chief Architect on the PepsiCo account, he repeatedly reached out to two of his colleagues on the transition team to acquire information concerning PepsiCo hardware necessary to perform his job. However, the two South Asian employees failed to respond to his emails and telephone calls seeking this information, and failed to provide him with any guidance regarding the PepsiCo project. Plaintiff escalated his concerns to Mr. Patel via email, and copied his two colleagues on the communication. Instead of helping Plaintiff obtain the necessary information, or encouraging Plaintiff's team members to cooperate with Plaintiff, Mr. Patel chastised Plaintiff, and instead informed him that he needed to "change his approach" when requesting information from these employees. Plaintiff's requests for help went unanswered for a month, until Mr. Patel finally organized a meeting with Plaintiff and his colleagues to encourage them to work with Plaintiff on the PepsiCo infrastructure transition and transformation project. Moreover, Plaintiff's South Asian colleagues routinely spoke in Hindi and other non-English languages both socially and while discussing client-related work, precluding Plaintiff from fully participating in these conversations.

26. Despite these challenges, Plaintiff performed well in his role servicing PepsiCo and received no verbal or written criticism regarding his performance. However, Plaintiff never

received a promotion or raise during his tenure with the company.

27. In or around July 2016, Mr. Patel called Plaintiff into his office for a meeting. After congratulating Plaintiff for his work servicing PepsiCo, he informed Plaintiff that he was being removed from his Solution Architect / Chief Architect position and placed on the bench. Mr. Patel then asked Plaintiff what he intended to do next. Plaintiff informed Mr. Patel that when he started with HCL, Mr. Patel had informed him that he would work on multiple accounts for HCL, and would be transferred to a new client once all issues relating to PepsiCo's infrastructure were resolved. Mr. Patel stated that he had no accounts available for Plaintiff to service, and told him to contact Human Resources ("HR") in order to locate his next project.

28. Plaintiff then spoke with a member of HCL's HR Department who informed him that he could only remain on the bench for thirty days, after which he would be terminated by the company. HR also referred Plaintiff to the offshore staffing team. The offshore staffing team presented Plaintiff with two open positions, and Plaintiff applied to both roles. Plaintiff also applied to open positions with HCL online. However, Plaintiff was never invited for an interview by HCL, and received no further contact from HR or the offshore staffing team. When Plaintiff reached out to HCL for updates regarding his employment, he was told that the company was checking with various managers regarding open positions, but Plaintiff was never offered a subsequent role with HCL.

29. Plaintiff remained on the bench for approximately one month. On August 26, 2016, HCL terminated his employment. He was not offered any severance payment by the company.

30. In 2016, Plaintiff applied online to two or three open positions with HCL. For example, in September 2016, Plaintiff applied to a Wintel Administrator position with HCL on Dice.com. The position was located in Dallas, Texas. On September 7, 2016, Plaintiff was contacted by Kasi Gupta, Talent Supply Chain for HCL America, Inc., and expressed interest in the open position. However, Plaintiff received no further contact from Mr. Gupta, and was never invited to interview for the Wintel Administrator position. He was not hired by HCL. In October 2016, Plaintiff was again contacted by Mr. Gupta regarding a Network Engineer position with the company in Marlborough, Massachusetts. Plaintiff expressed interest in the position and confirmed his salary requirements

with Mr. Gupta on October 7. Again, Plaintiff received no further contact from Mr. Gupta regarding his candidacy and was not interviewed, nor hired, for the Network Engineer position.

31. In 2017, Plaintiff applied online to at least three positions with HCL in the Dallas, Texas area. Plaintiff received no response from HCL, was not invited to interview with the company. He was not hired for any of the open positions, despite his excellent qualifications and considerable experience.

32. In March 2018, Plaintiff was contacted by a recruiter from HCL regarding a Compute Solutions Manager / Architect position with HCL America, Inc. in Frisco, Texas. Mr. Voll expressed interest in the position and participated in three interviews with HCL employees during the month of March. However, despite performing well in these interviews, Mr. Voll was not hired by HCL for the Solutions Manager / Architect position.

33. On June 9, 2018, Plaintiff applied to a VMware Level 3 Administrator position with HCL in Frisco, Texas on Dice.com. Two days later, Mr. Voll provided HCL with a copy of his resume and various information concerning his candidacy. Following this email communication, HCL never contacted Mr. Voll regarding the VMware Level 3 Administrator position, and he was not hired for the role.

34. On July 3, 2018, Plaintiff applied to a Solution Architect position with HCL on Dice.com. Mr. Voll communicated with an HCL employee regarding the position on July 13, but was never invited to interview for the Solution Architect position with HCL.

35. In mid-July 2018, Plaintiff received a call from Sunaina Mittal, a member of HCL America, Inc.'s Resource Management Group, regarding an OpenShift Architect position with the company. Ms. Mittal is South Asian and located in India. Mr. Voll expressed interest in the position, but has not been invited to interview for the OpenShift Architect role.

**CLASS ACTION ALLEGATIONS**

36. Plaintiff brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for HCL's systematic pattern and practice of discrimination against non-South Asian individuals in the United

States. This action is brought on behalf of the following class:

> All individuals who are not of South Asian race who applied for positions with (or within) HCL in the U.S. and were not hired, who were employed by HCL in the U.S. and sought a promotion but were not promoted, and/or who were employed by HCL in the U.S. and were involuntarily terminated.

37. Members of the class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of class members is unknown to Plaintiff, it is believed to be in the thousands. Furthermore, class members are readily identifiable from information and records in HCL's possession.

38. There are numerous questions of law and fact common to members of the class. Among the common questions of law or fact are: (a) whether HCL has intentionally discriminated against individuals who are not of South Asian race in making employment decisions; (b) whether HCL has intentionally favored South Asians in hiring, promotion/demotion, and retention decisions and/or whether HCL has intentionally disfavored non-South Asians in hiring, promotion/demotion, and termination decisions; (c) whether HCL's policy and practice of relying on South Asian visa and local workers is intentionally discriminatory; (d) whether HCL has violated § 1981; (e) whether equitable and injunctive relief is warranted for the class and (f) whether compensatory and/or punitive damages are warranted for the class.

39. Plaintiff's claims are typical of the class. Members of the class were damaged by the same discriminatory policies and practices employed by HCL.

40. Plaintiff will fairly and adequately protect the interest of other class members because he has no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class litigation to represent him and the class.

41. Plaintiff and the class he seeks to represent have suffered substantial losses in earnings and other employment benefits and compensation as a result of HCL's actions.

42. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because HCL has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiff and the class as a whole.

Members of the class are entitled to declaratory and injunctive relief to end HCL's systematic, common, uniform, unfair, and discriminatory policies and practices.

43. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) for determination of the damages claims of individual class members because the issue of liability is common to the class and the common nucleus of operative facts forms the central issue, which predominates over individual issues of proof. The primary question common to the class is whether HCL has discriminated on the basis of race in their employment practices. These questions are central to the case and predominates over individual issues among the members of the proposed class. HCL has engaged in a common course of discriminatory conduct in a manner that has harmed all of the class members. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because certification will avoid the need for repeated litigation by each individual class member. The instant case will be eminently manageable as a class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

44. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) to litigate Plaintiff's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate HCL's discrimination. Certification under this rule is also appropriate to decide whether HCL has adopted a systemic pattern and practice of racial discrimination in hiring and employment decisions. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## COUNT I

**(Disparate Treatment on the Basis of Race)**
**(Violation of Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981)**
**(On behalf of Plaintiff and the Class)**

45. Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

46. This claim is brought by Plaintiff on behalf of himself and the class.

47. Throughout the class liability period, HCL has engaged in a pattern and practice of discriminating against individuals who are not of South Asian race by: (a) knowingly and intentionally favoring individuals of South Asian race in employment decisions, including hiring,

promotion/demotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not of South Asian race (including Plaintiff) in employment decisions, including hiring, promotion/demotion, and termination decisions, (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States consisting of approximately 70% or more South Asian employees (primarily from India).

48. As a direct and proximate result of HCL's intentional discrimination, Plaintiff and class members have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion, compensation, and/or continued employment with HCL.

49. HCL's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the class pray for relief as follows:

a. Certification of the case as a class action pursuant to Fed. R. Civ. P. 23;

b. Designation of Plaintiff as representative of the class;

c. Designation of Plaintiff's counsel as counsel for the class;

d. A declaratory judgment that the practices complained of herein are unlawful and violate the Civil Rights Act of 1866, 42 U.S.C. § 1981;

e. A permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f. Order Defendants to adopt a valid, non-discriminatory method for hiring, promotion, termination, and other employment decisions;

g. Order Defendants to post notices concerning its duty to refrain from discriminating against employees on the basis of race;

h. Award Plaintiff and the Class damages – including (without limitation) compensatory, exemplary, and punitive damages for the harm they suffered as a result of Defendant's violations of § 1981;

i. Award Plaintiff and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendants' discriminating against them in violation of § 1981;

j. Award Plaintiff and the Class front- and back-pay, reinstatement, and such other equitable relief as the Court deems just and appropriate;

k. Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

l. Award Plaintiff and the Class such other relief as this Court deems just and appropriate.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Plaintiff and the Class respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED: August 15, 2018

Respectfully submitted,

By: /s/Daniel Low

Daniel Low, SBN 218387
**KOTCHEN & LOW LLP**
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone: (202) 471-1995
Email: dlow@kotchen.com

*Attorney for Plaintiff Reese Voll and Putative Class*